Good morning, Your Honors. May it please the Court. My name is Chloe Wiegel and I, along with Deepika Chandrasekhar, are Pepperdine students representing Appellant Glenn Leonard. I will address the two questions received in the Court's order and the merits of Mr. Chandrasekhar will address the First Amendment retaliation claim. At this time, we would like to request three minutes for rebuttal. To the Court's first question, our challenge to the District Court's alternative qualified immunity holding was not waived. The issue was preserved because we briefed the merits of the constitutional rights violations, and in the context of this case, there is no distinction between the analyses on the merits and qualified immunity. When did you do that for the first time? I'm sorry? You said you briefed it. When did you first brief it? We put it under formal headings for the first time in the reply brief, but because the case law on the merits of the constitutional question, which we briefed extensively in our opening brief, itself demonstrates that the constitutional violation is clearly established, our challenge was preserved. Why is that? Why do you think it's preserved? Because generally issues not raised in the opening brief are waived, so I'm trying to figure out why we should consider the merits of your arguments here. Your Honor, because our briefing on the merits addresses that there are clearly established rights that are violated and that there are tribal issues as to whether Mr. Leonard alleged Eighth and First Amendment violations, it's preserved, just not under the formal heading of qualified immunity. However, even if this Court finds that our challenge was waived, it should utilize its discretion to overlook the waiver because there is no prejudice to Appelese, but there is prejudice to Mr. Leonard. Appelese faced no prejudice because both sides briefed the merits of the constitutional rights violations, and Appelese discussed qualified immunity substantively. I'm sorry, what? I didn't hear the last thing you said. Appelese briefed qualified immunity substantively. When? In their briefing on page 16 and 17. Of what? Of their, in response to our opening brief. To the Court's second question. Can you show me, tell me where that is, 16 and 17 of their briefs that you're relying on? Yes, Your Honor. So they, Appelese state, as the magistrate held in the district court adopted, the defendants are entitled at a minimum to qualified immunity as to plaintiff's claims. It is clearly established that there is a generalized duty to protect inmates from harm. And then they go on to page 17 as well. So that's what you, you think that's sufficient? They did raise it, and they understood that they could raise it. That is what they believe was sufficient to address qualified immunity in their brief. And do you have any case or authority to, would help you in that regard? So Kerner v. Griegas, K-O-E-R-N-E-R v. Griegas, G-R-I-G-A-S, 328 F. 3rd, 1039, stated that if Appelese discuss the issue that was not waived, then there's no prejudice to them. And then to the Court's second question, Appelese waived their right to assert the doctrine of waiver because they did not argue that we waived our challenge in their brief. So in other words, you're saying they waived waiver? Yes, Your Honor. It is well established that the government can waive waiver implicitly by failing to assert it. Turning to the merits of Mr. Leonard's Eighth Amendment claims, there are tribal issues as to whether Officers Bruce and Peters were on notice when looking at the totality of because Leonard sent them seven kites detailing the escalating threats and perpetual harassment that he faced on his unit. Let me ask you about that because Mr. Leonard's kites to Bruce and Peters did not mention Crump by name. So my question is, were these kites sufficient to make Bruce and Peters subjectively aware of the substantial risk of serious harm? Yes, Your Honor, because it is irrelevant to liability that officials cannot pinpoint the exact inmate who would potentially cause the future harm. Well, if you had a thousand inmates in this institution and the officers didn't know who was specifically a threat, what are they supposed to do? The standard is reasonable steps to abate that risk. They could have merely asked Mr. Leonard to point out these gang members who he is repeatedly saying is causing him threats and harassment. That is a reasonable step to discover what the risk is and figure out where it's coming from. However, there was one specific inmate that put Bruce and Peters on notice of a substantial risk of harm to Mr. Leonard, and that is Mr. Crump. So after the attempted assault, video footage caught inmate Crump attempting to enter Leonard's cell and subsequent prison reports actually stated that this could incite future harm and violence. Didn't the prison officials then sanction Mr. Crump and put him in solitary confinement for seven days? They did, Your Honor, but that is not enough. According to Wilk v. Nevin, they held that officers did not take reasonable steps when they released that same inmate to the same unit with contact again because there was no evidence that there was any changed circumstances. But here, I mean, I think it's a little bit different because for Crump, I mean, I think that there's a reasonable expectation or maybe hope that if you sanction someone there by placing him in solitary confinement that it would deter him from taking further action. So here, I mean, it seems like a reasonable supposition by the prison officials that we saw him trying to attack the plaintiff here, and they punished him, and the hope is by being punished he won't do that again. It seems like a reasonable position. In hindsight, it wasn't, but why isn't that a reasonable position for the prison officials here? So while that is the hope, Your Honor, Mr. Leonard sent four additional kites during this time saying that the threats and harassment had not let up, and he identified Crump as being part of the group of inmates, those white gang members who had continued. So the prison report stating that this could incite future violence and encourage others to engage in this type of harassment and putting Crump with that group, it's reasonable that a juror could conclude that he would follow through with his attempt if he's released to the same unit. Thank you. Do you have another question? No, I'm good. Thank you. I think your time is up. You have your colleague, I guess, who wants to argue. Good morning, Your Honors, and may it please the Court. My name is Deepika Chandrashekar, and I will be addressing Mr. Leonard's First Amendment retaliation claim against Captain David Pedro. Of the five elements of a retaliation— Are you going to talk about Gibson also? Your Honor, we can discuss that on rebuttal, if the Court would like. Why? I could discuss it as well now. But I would like to first address— Yeah, sure, go ahead. Okay, thank you. I'd like to first address the First Amendment claim against Captain David Pedro. Of the five elements of a retaliation claim, the only elements in dispute are the adverse action and the chilling effect, which I will address in turn. Mr. Leonard has presented sufficient evidence for a jury to find that Pedro retaliated against Leonard for filing grievances against prison officials. As to the adverse action, there are three instances where a jury could find that Pedro threatened Leonard for filing grievances. I'd like to first address the meeting that occurred after Pedro learned that Leonard had filed a tort claim against Officer Bruce. Pedro summoned Leonard into his office and told him, and please excuse me, Your Honors, I'm quoting here, you're on my shit list, and don't ever ask me or my staff for anything again. Leonard then went to write in his affidavit about how the power dynamics at play terrified him. Hearing that kind of threat from a senior-level prison official caused him great fear and apprehension. He understood that this official had control over various aspects of his life, such as his housing, such as the inmates that he was surrounded by, and whether or not other prison officials would provide him with security, which he desperately needed considering he was the victim of a brutal assault just a few weeks earlier. I'd like to next address the meeting that occurred after Leonard filed grievances against all of the officials involved with housing following Crump's assault. In that meeting, Pedro once again summoned Leonard to his office and yelled at him, telling him that if he was not content with his current housing, he could find him some, quote, alternative housing, which Leonard then understood to mean either another gang unit where he would get beaten up again, or a disciplinary segregation unit, which by its very name intimates that Leonard has done something wrong and is being disciplined for it. And on the third meeting, while discussing a complaint Leonard filed against Pedro himself, Pedro reiterated his directive that Leonard should not ask him or his staff for anything and threatened to hold Leonard accountable if he did so. This case is really like Brodheim v. Cry, Your Honors, where the court found that even a mere threat can constitute an adverse action because it can have a chilling effect. What do we make of the fact that Leonard was undeterred by all of this and he still proceeded with his effort to try to, you know, get response from the prison officials? Yes, Your Honor. So that goes to the chilling effect element, and what's required from the chilling effect is merely if the defendant's acts would chill or silence a reasonable person. And so that's not a high standard, Your Honor. That doesn't look at if Leonard himself was specifically chilled, but rather if a jury could find that a reasonable person could have been chilled by Pedro's actions. And this court in Brodheim found that a threat is sufficient to create a chilling effect because of that fear and that apprehension that it creates. That fear and apprehension is the chilling effect. There is no follow-through that's required. Just because Leonard continued to file grievances doesn't mean that he was fearful and that he was hesitant to proceed with those grievances. And, Your Honor, turning back to Brodheim, when it comes to a threat, the standard for a threat is a statement that warns a person to stop doing something and carries the implication of some consequence of a failure to heed that warning. And a jury could certainly find that here the facts go beyond those of Brodheim because there were three verbal instances where Pedro threatened Leonard with some consequence. A jury could also find that there was a chilling effect because of the fear and apprehension Leonard experienced. Thank you. If we could turn to Gibson, then. Go. Why wasn't Gibson's response reasonable here? Yes, Your Honors. So looking at the video of the assault in the light most favorable to Leonard, there are triable issues as to whether Gibson's response was reasonable. And we're not looking at timing here, Your Honors. We're looking at reasonable conduct. So reviewing that video. Well, how do we not factor in the timing with the reasonable conduct? Because it seems within 10 seconds he responded. So I'm trying to figure out if you have any authority that would help your position. Yes, Your Honors. So you're right that timing is a factor that goes into the reasonableness standard. But looking at the video in the light most favorable to Leonard, a jury could find that that response. How exactly do you do this? Well, reviewing that video, a reasonable juror could find that Gibson turned towards Leonard and turned towards that assault several times and still delayed his response. Looking at the light most favorable to Leonard, the video shows that every other inmate in the surrounding area turned their head and looked at the assault and that that went on for an extended period of time before Officer Gibson intervened. But the other inmates didn't have a cart in between them and the assault occurring. Yes, but the cart itself is a factual issue, Your Honor. A reasonable juror could find that Gibson is a very tall man. He could see over the cart and that it's a factual issue that should go to a jury. All right. Well, let me see if you have any other questions. Thank you. All right. Thank you very much. Thank you. May it please the Court, Denise Fjordbeck on behalf of the appellees in this matter. Addressing first the question that was posed by the Court, as counsel for Mr. Leonard indicated, our brief did raise the qualified immunity issue first in our summary of argument and then in the argument itself. And we also noted in our standard of review section of the brief that summary judgment may be affirmed on any ground that's supported by the record. So in light of the appellant's failure to advance any argument on that point before the reply brief, our position is that those admittedly brief references were sufficient to place the issue before the Court and that the decision below should be affirmed. Specifically what issue before the Court? The qualified immunity issue. The alternate basis or one of the several bases on which the District Court granted summary judgment was that all of the officers were entitled to qualified immunity. And plaintiff did not address that argument in his opening brief at all. I'm just trying to figure out, in your answer to your brief, you're saying you did argue that Leonard waived his qualified immunity argument? Because I didn't see it. We didn't argue waiver. We did argue that the judgment should be affirmed on the basis of qualified immunity. So you argued it on the merits? Correct. The other thing that we would note about the opening brief is that it doesn't appear that there's any argument that defendant Archer, appellee Archer, that there was any error in granting summary judgment as to him and the judgment in his favor should therefore be affirmed in our view. Is Archer one of the COs at issue on this appeal? Well, he was named as a defendant. He's named as an appellee. But I don't see anywhere in the opinion. I mean, I thought it was, you know, Peters, Bruce, and Gibson. Peters, Bruce, and Gibson are the ones that are addressed in the argument in the opening brief. And our view is they're the only folks that are at issue. And so the judgment in Archer's favor should be affirmed at a minimum. It doesn't appear that the district court or the magistrate court explained why the defendants are entitled to qualified immunity. It seems like both judges only concluded that qualified immunity applied without any analysis. Even if we might or could affirm the district court when it provided no reasoning for its decision, should we? Well, I think that the short shrift that's given to the analysis reflects that the clearly established law in this area is that there has to be something that puts the officials on notice so that they are both objectively aware that there's a substantial risk of harm and then subjectively aware of an excessive risk to the plaintiff. You don't think the eight kites did that? No, Your Honor, because what were they supposed to do with those kites? He made a number of vague complaints about threats by white gang members. He didn't ever identify those people beyond saying that there were white gang members. Well, he mentioned Crump. He did mention Crump. He mentioned Crump after the, I would call it, I guess, a feint in his direction. There was an incident where Crump attempted to follow him into his cell and was prevented from doing that. But when Crump made that aggressive gesture, they did take appropriate and swift action against him. They removed him. They questioned him and investigated what had actually happened. And then they sanctioned him to several days, I think seven days, disciplinary segregation and loss of privileges. But then Crump returned to proximity of this man madder than ever. Well, you know, certainly that is what ended up happening. But in terms of how you analyze this from a constitutional standpoint, what happened here doesn't amount to deliberate indifference. The purpose of, you know, using these disciplinary sanctions is obviously both to punish and to deter the behavior. And so, you know, they screw on her. And I appreciate that because the seven days is, you know, something that we need to look and consider. But I guess one way to view it is that Crump was only disciplined for seven days and then immediately attacked Mr. Leonard upon release. And I'm just trying to figure out how to distinguish this case from Wilk, where we concluded that separating the plaintiff from the aggressor for 10 days was insufficient under the Eighth Amendment to mitigate the threat, when there was no reason to believe that the aggressor no longer wished to attack the plaintiff. It seems like that's that's that case. I'm trying to reconcile that with what you're arguing. Wilk, to us, is distinguishable on its facts. In that case, there was a threat to kill from a specific inmate. The defendants were aware of that threat, both objectively and subjectively. The plaintiff in that case made an actual conflict report, so that there was the reporting that should have triggered separation of them within the prison system. And it was clear that the inmate there held great animus against the plaintiff. Here, when they investigated, Crump admitted that he did try to enter the cell, but he didn't make statements indicating that he had a specific problem with plaintiff. And it reasonably appeared to the prison officials involved that the disciplinary sanction should be enough to punish and deter the conduct. Even though Leonard warned Bruce and Peters that the threats escalated and it was only a matter of time before he was hurt, and this was after Crump did the attempt to assault him? Or to enter his cell? I think it was entering his cell. Yes, tried to follow him into his cell, apparently, and was unsuccessful in doing that. Once Crump is out of the picture in disciplinary segregation, again, those complaints were vague complaints about white gangbangers. There was no evidence that was ever developed before or after the assault that there was a white gang or that Crump was a member of a white gang. And so it simply wasn't the information that they had was not sufficient, either objectively or subjectively, to place them on notice that he continued to be in danger. Do we look at this in the light most favorable to the plaintiff? Yes, sure. I mean, wouldn't you say because of what you just said right now, or because of this discussion, there's at least a question of fact with respect to that? Well, I think if you look at it in light of this court's case law in general, what the court has generally required is, if not a threat from a specific individual, an identified group of individuals such that decisions can be made and things can be put in place. People complain about their housing assignments all the time, and certainly the plaintiff was very vocal that he wanted to be moved, and he wanted to be moved to a specific other location. Well, apparently he had a basis wanting to be moved. I mean, I understand that there's a lot of folks in the jail who want to be where they want to be or somewhere else, as Judge Parker has noted. I think they all want to be somewhere else. Yes. But it seems like there was a line here of threat. Well, yes, certainly there was a line of threat from Crump, but again they took reasonable steps to try and, you know, deter and alleviate that threat. And it wasn't, in light of all of the circumstances, even reading them in the light most generous to the plaintiff. Can we move? And I'm sorry, if you want to finish that thought, you may. I wanted to move to Pedro for a minute, if we could. Yes, certainly. So the plaintiff did file a number of grievances after the event, and those grievances, for the most part, were filed before Officer Pedro said that the plaintiff was on his list. Certainly there's good evidence that Pedro was unhappy with plaintiff and that he voiced that unhappiness. But there was never any action. What was he unhappy about? The initial unhappiness was apparently that when the plaintiff came to talk to him about grievances, he didn't tell Pedro that he had already filed the notice of tort claim, and Pedro felt that that was dishonest and that he should have let him know that. And then I think Pedro continued to be unhappy because... Of course he had a right to file that tort claim, right? Correct? Obviously, sure. He had a right to file the tort claim, and he did file the tort claim. He had a right to file grievances, and he did file grievances. And he had a right to file and continue to pursue the conflict with Crump in particular, and he did all of those things. Why would those things get Gibson on somebody's shit list? I think that... Sorry, Leonard. Leonard. If those were all perfectly regular steps that he was entitled to take, why would a prison official put someone who did what he had a right to do on his shit list? He certainly had a perfect right to do it, but the evidence seems to indicate that Pedro felt that plaintiff simply hadn't been honest with him about what was going on. What was the issue? That was the source of his... It wasn't that he didn't have the right to do that. Well, but the question is, was this retaliatory? And I'm just trying to figure out how it wouldn't have chilled somebody who's trying to, you know, figure out a way to avoid getting beat up by individuals or other gangs, which I'm sure is an issue for prison officials that we want to make sure they can handle. But when Pedro... I mean, Mr. Leonard outlines, you know, three specific instances where Pedro became angry and aggressive and stated that if Leonard was not content with his current housing, that he could find some... that Pedro would find him some alternative housing. Leonard thought that Pedro's threat of alternative housing was going to land him in another gang unit. And then when he met with Pedro, Pedro was visibly shaking and ranted for several minutes, telling Leonard that Leonard had lied to him and deceived him. And because Leonard did not tell Pedro that he had filed the tort claim notice, then as Leonard was leaving, Pedro continued to yell as Leonard walked down the hallway, stating, you are now on my bad list, and don't you ever ask me or any of my staff for anything. I mean, that seems rather threatening, and it seems like it was intended to have what happened, which was what Leonard understood was to shut his mouth and drop any action against the officer. So we're here trying to determine, if it's not waived, whether or not this is sufficient for Leonard to go forward with his claim. Well, and I'm out of time, but if I could just briefly, Your Honor. The district court found, and I think the record supports that Pedro was angry and blowing off steam, but there was no retaliation. There was no chilling effect. The plaintiff continued to pursue all of the courses that were open to him, and in our view, that doesn't amount to a First Amendment violation. Unless the court has other questions, we would urge you to affirm the district court judgment. Thank you. Thank you very much. So I'd like to jump in and address the court's earlier question for an authority supporting our argument for Gibson. We would like to cite Castro v. County of Los Angeles, which was cited in our brief and stands for the proposition that there is circumstantial evidence that an officer failed to intervene in a timely manner. And I'd like to next jump to the kites, the initial kites that Leonard sent to Bruce and Peter's. Even if those first seven kites don't show enough knowledge, Your Honors, after the attempted assault and the attack, that certainly does. A jury could certainly find that that was sufficient to put Bruce and Peter's on notice, that there was an inmate who posed a threat to Leonard. After the attempted assault, they had a specific named inmate, and they had subsequent prison reports stating that that could lead to future violence. And again, Your Honor- They disciplined him. They did discipline him, Your Honor, but they released him straight back into the same exact unit as Mr. Leonard just a mere seven days later. And within two and a half hours of that release- The man made a threat, and he was, what, put in solitary confinement for, what, six days? Yes, Your Honor. I mean, that's not trivial. That's not a trivial response, is it?  Or just a threat. That's a question for a jury, whether that was a reasonable step or not. And furthermore, it's a question for a jury whether it was reasonable to then release Crump into the same exact unit as Leonard when there was no evidence that the circumstances had changed or that Crump wouldn't then go and follow through with that threat. And the court asked if this case is governed by Wilk v. Nevins, and we agree that that case does govern here. This is an instance where there were no changed circumstances like Wilk v. Nevins. And yet they released him right into the same unit as Leonard, and he made better efforts. Wilk, it seems like it was more serious conduct than here. Does that matter? Well, it's a question for a jury to determine if that was serious conduct that should have been dealt with differently. That's a question that a jury should answer. And then there was a question about or there was an argument about whether the white gang was a specifically identified group. And, Your Honor, Hearns v. Terhune stands for the proposition that naming a specific group could be enough to put prison officials on notice. And that makes sense, Your Honors. If an inmate is being threatened by a group, then presumably that group isn't telling the inmate which one of their members is going to be the one to carry out that threat. Well, does the record reflect what proportion of this prison population was white? That is not in the record, Your Honor. Any concluding statement? Yes, Your Honor. Because there are multiple triable issues of material fact in this case, we respectfully request that this court reverse the district court's grant of summary judgment and remand the action so that a jury may consider these disputed issues. Thank you. Thank you. Thank you. The case of Glenn Elliott Leonard v. Colette Peters is now submitted. Before we move on to the next case, I do want to take a moment to thank Ms. Fjordbeck for her oral argument. But in particular, I want to acknowledge our appreciation to the pro bono project here at Redine Law School. Mr. Kressel, thank you for being the supervising pro bono attorney. And Ms. Weigel and Ms. Chandrasekar, thank you so much for your oral argument presentations today. We appreciate the student attorneys and their efforts here today. Thank you.
judges: MURGUIA, Parker, LEE